IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:15-CR-319-ELR |
| v. | : | |
| | : | (Exhibits filed under seal) |
| MICHAEL C. FORD | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, through undersigned counsel, files this Memorandum in Aid of Sentencing. The defendant, Michael C. Ford, was indicted on August 18, 2015, charged with nine counts of Cyberstalking, in violation of 18 U.S.C. § 2261A; seven counts of Computer Fraud and Abuse (hacking), in violation of 18 U.S.C. § 1030(a)(7), and one count of Wire Fraud, in violation of 18 U.S.C. § 1343. Ford pleaded guilty to all 17 counts on December 19, 2015, and sentencing is scheduled for March 21, 2016.

The government recommends a sentence of 96 months of incarceration, followed by three years of supervised release, as a sentence sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a). The seriousness of Ford's crimes, along with the profound need to provide specific deterrence to Ford, as well as to provide general deterrence to other would-be

1

"sextortionists," dictate the government's recommendation. Additionally, a 96-month sentence would be in line with sentences imposed in similar cases.

## FACTUAL BACKGROUND

### A.     Charged Conduct

From at least January 2013-May 2015, Ford engaged in a widespread, international computer hacking, cyberstalking, and "sextortion" scheme, victimizing hundreds of people in the United States and abroad. He did so primarily while he was employed by the U.S. State Department at the U.S. Embassy in London, during work hours, while using his U.S. State Department-issued computer. He specifically targeted young females, with a particular focus on members of sororities and aspiring models.

Ford collected thousands upon thousands of potential victims' e-mail addresses and sent fraudulent "phishing" e-mail messages to those accounts. In those messages, Ford claimed to be a member of Google's non-existent "account deletion team" and stated that the victims' online accounts would be deleted unless they provided their passwords. (See Gov. Ex. 1).

The sheer number of phishing e-mails that Ford sent is astounding. For example, on one day alone, April 8, 2015, Ford sent phishing e-mails to

approximately 800 unique e-mail addresses. On the same date, Ford then sent 180 follow-up e-mails to potential victims who had not yet responded to his original phishing e-mail, as well as approximately 15 e-mails to victims who had provided incorrect passwords. Considering Ford's daily volume, repeated over the course of several months, the number of Ford's potential phishing victims is staggering.

Ford then used the passwords obtained from his phishing scheme to hack into his victims' online accounts. Once inside, he searched for, and frequently obtained, sexually explicit photographs of the victims, as well as personally identifiable information (PII) of the victims and others. When he found sexually explicit material, Ford forwarded it to himself, creating a personal repository containing thousands of stolen sexually explicit images.

After stealing his victims' sexually explicit photographs and PII, Ford then transitioned into his "sextortionate" conduct. Ford e-mailed his victims with their photos attached. When they responded with shock, confusion, anger, and fear, Ford replied with escalating taunts and demands. He laughed in the face of their fear, and he attempted to force them to victimize others, frequently demanding that they take voyeuristic videos of "girls" and "sexy girls" in locker

rooms and changing rooms. He threatened to distribute their photos and PII if

they refused to comply, and in several instances, he followed through on his

threats and distributed the photos.

When victims responded defiantly, Ford's threats escalated and sometimes

suggested future physical violence. For example, in January 2015, Ford began

harassing I.M., a female living in the Middle District of Florida. When she

responded to him with anger, Ford threatened to post the following

advertisement online, inviting strangers to come to I.M.'s home and rape her:

> "Hey there! :) My name is [I.M.] and I love to fuck. I don't care who
> it's with or when it is. I just need it all the time. Please email me [I.M.'s
> email address], phone me [I.M.'s telephone number], or just stop by
> my house and say hello [two residential addresses associated with
> I.M.]. I hope you love these pictures and videos that I made (attach
> pictures and videos). **If you stop by my house, I may play hard to
> get, but that's because I really like it that way.** Don't be shy, I'll fuck
> you all night!" (See Gov. Ex. 2).[1]

Notably, Ford conducted his phishing, hacking, and cyberstalking

scheme with stunning efficiency. For example, on April 24, 2015, from his

Embassy computer and while ostensibly working, Ford hacked into a

model agency's e-mail account at 12:56 p.m., and over the course of one

---

[1] The government notes that formatting issues arose when converting the electronic e-mail messages into a printed format.

hour, he searched for and stole nude photos belonging to eight women, forwarding them to his repository account. He then deleted the forwards from the modeling agency's account. At 1:56 p.m., Ford logged into his repository account and logged into a second account that he used to communicate with his victims. He downloaded four photos of a particular victim, saved them to his desktop, attached them to an e-mail to the victim using his other account, and sent her an e-mail stating, "Love these pictures of you!" He then deleted the photos from his desktop. This entire process took Ford only two minutes. At 1:58, he followed the same steps for a second victim. At 1:59 p.m., he followed the same steps for a third victim. And at 2:01 p.m., he did the same for yet another victim. In the course of just five minutes, Ford initiated his pattern of harassment with four new victims.

Consistent with this pattern, on one single day, April 27, 2015, again on a supposed work day, Ford sent his initial harassing e-mail with photos attached, following the same steps as detailed above, to **98 new victims**. One only develops that level of efficiency through regular practice, and unfortunately for his many victims, Ford was an expert.

5

Ford's predatory criminal conduct was not only widespread and ruthless, but it was also escalating. Ford was arrested on May 17, 2015, and during a post-arrest interview, Ford confessed (albeit largely minimized) to his ongoing pattern of criminal conduct. During the interview, Ford made statements that not only minimized his criminal conduct but also showed a disturbing risk of further escalation and danger. For example, he stated that it made him "mad" when his victims refused his demands or refused to communicate with him. He stated that he knew his victims felt terrible. He stated that while he occasionally masturbated to the stolen photos, it was primarily about "power" and not about the photos themselves. He stated that his wife is the "alpha and breadwinner" in their family, and he was doing this to fill a "power void." Eventually, he found that the photos "weren't enough" and that he "wanted more." He stated that he wanted to feel "big" and "important."

### B.   <u>Relevant Conduct</u>

In the lead up to, and during, Ford's criminal activity described above, Ford also engaged in troubling relevant conduct that should be considered in determining Ford's sentence. From mid-2009, shortly after Ford started working

6

at the Embassy, continuing up until his arrest in May 2015, Ford engaged in an

ongoing scheme in which he posed as a model scout to fraudulently obtain

topless and sexually explicit photos from aspiring models, to include several

minors. Many of the females he duped became the first victims of his

cyberstalking as his conduct began to escalate, to include Jane Doe One. Because

his charged conduct seamlessly evolved from his prior scheme, all of his conduct

beginning in mid-2009 should be considered as relevant conduct at sentencing.

### Talent Scout Ruse

On September 21, 2009, Ford opened the e-mail account

talentscout2idealglamour@googlemail.com using the name "David Anderson."

Shortly thereafter, Ford began using the deceptively-named account to pose as a

model scout to initiate contact with young women he found on modeling

websites and message boards. At his request, and with the belief that he was a

legitimate talent scout from Ideal Glamour (which appears to be the name of a

London-based modeling agency), the women sent him photos of themselves and

personal information, such as their names, measurements, and dates of birth.

Ford fraudulently told the women that he was scouting models for well-known

retailers such as H&M, as well as for publications such as Playboy and requested

that the women send topless and nude photos. Frequently, he made additional requests for increasingly explicit photos, stating that he needed more material to make his casting decisions. In several instances, he falsely informed women that they had been selected for modeling jobs, and he sent fake contracts to the women, seeking additional personal information, to include bank account routing information for the purported payment. (See Gov. Ex. 3).

Using this talent scout ruse, Ford fraudulently acquired thousands of topless, nude, and sexually explicit photos, some of which depicted minors. He stored these photos in a repository e-mail account. Ford later used these photos to harass some of these women from a new e-mail account.[2]  Accordingly, his early relevant conduct evolved into his charged conduct, and it should be considered in determining his sentence.

During the course of his talent scout fraud, Ford also engaged in a phishing scam to trick victims into giving him their e-mail account passwords. He falsely told the prospective models that his agency operated a "calendar"

---

[2] For example, the defendant first contacted Jane Doe One, posing as one of his victims, E.D., in June 2014 regarding fake modeling opportunities. Through his talent scout ruse, the defendant obtained at least one photo of Jane Doe One, and using his calendar ruse (discussed in the next paragraph), he obtained Jane Doe One's e-mail password. After hacking into Jane Doe One's e-mail account, the defendant obtained a partially nude photo of Jane Doe One, who was a minor at the time. In January 2015, the defendant used the nude photo to begin harassing Jane Done One via e-mail. (See Gov. Ex. 4(a), 4(b), and 4(c)).

system in which the agency would send advertisements for modeling jobs to the women's e-mail calendars. He told them that he needed their e-mail passwords to enable this fictitious notification system, explaining that the system would only allow access to post calendar items and would not permit access to e-mail content, contact lists, etc. (See Gov. Ex. 5). Ford used this early phishing scam to collect passwords for hundreds of e-mail accounts, presumably so he could then hack into those accounts in search of sexually explicit photographs and personal information about his victims. He later changed his phishing scam to the "account deletion" scam described in the Indictment and Plea Agreement.

### Adult Website Ruse

On November 23, 2009, Ford opened the e-mail account

scoutforstorm@googlemail.com. Using this account, as well as his Talent Scout account, Ford sent a fake advertisement, copied in part below, to hundreds of aspiring models with whom he was communicating, some of whom were minors.

> …A friend and I run a video content website that is registered in Asia… our members live in Asia I wanted to see if you might be interested. We also have a software program that allows us to blur out your face if you do not wish for this to be seen. Also, if this is not something you would do yourself, there are videos to be made that would not feature yourself being in them. These also, [sic] pay the

most as this is what our members want to see. If you are interested in these, please let me know and I can explain more. It is a great way to earn some money quickly without the worry that someone would know who you are…

Here are the sample styles/payments

Stripping/Webacm dance: pays between 150-300GPB per video

Solo self play: pay ranges from 300-500GBP per video depending on the level involved and if any toys/props are used.

sex: f/f or m/f pay ranges from 500-750GBP

voyeur/hidden camera: pays from 750GBP to unlimited depending on the type of video submitted

(See Gov. Ex. 6).

Ford sent this advertisement to hundreds of women, including several minors. Many of the women declined, but some pursued the opportunity, sending Ford increasingly explicit photos and videos at his specific coaching, expecting payment that they never received.

### Preying upon Minors

When Ford posed as a talent scout to engage with aspiring models, early on in his communications with them he requested that they send personal information, to include their dates of birth. When the girls provided Ford with dates of birth that clearly indicated they were under age (and as young as 14),

Ford continued with his ruse, undeterred. Indeed, as an added enticement, Ford offered a "parental consent" form to try to close the deal. (See Gov. Ex. 7). Ford tricked them into sending photographs for evaluation, eventually requiring that topless and nude photos be submitted for consideration for certain campaigns.

The government has identified at least seven minors with whom Ford was communicating, several of whom he duped into sending topless or partially nude photographs of themselves. In each instance, Ford was fully aware that they were minors, yet he continued to press them to send additional, often more explicit, photographs of themselves and others.

For example, in August 2013, Ford engaged in an e-mail and chat conversation with a 15-year-old female with the initials L.H., requesting topless photos from her. L.H. asked him: "r u totally sure i can do nude pics at 16?" and Ford responded, **"i am 100% sure. I've been doing this job for years and have placed many 16 year olds."** L.H. then explained that she was not yet 16. She then asked, "what sort of pubic hair would i need?" and he responded, **"do you mean do you have to be waxed or shaven…totally up to you."**

Ford's conversation with L.H. later turned to his adult website ruse, when he sent her the website advertisement in March 2014. In response, L.H. asked, "Is

11

my being 16 a problem for being in ur vids?" and he responded, "not at all."

When she asked follow up questions about doing the hidden camera video

option listed in the advertisement, Ford instructed her to set up the camera in the

changing/dressing area at her school. He then instructed her to "video others

without them knowing it" and asked "In the dressing room at your school, do

they [sic] girls get nude/topless?" She remarked, "i dont know. some of them are

younger then me" and explained, "12 upwards." When L.H. asked him the

minimum age he would want, Ford responded, **"your age [16] is good."** Ford,

who was apparently very eager to see the videos immediately, continued,

"would you be able to try one tomorrow so I can see how it looks, and also one

of just yourself? …if you are at home now, you could always do the one by

yourself." Ford later offered, "since you are new to this, how about I make you a

deal…. for every video that you send to me before 3pm on Friday (that is of

suitable material), I will pay you an extra 150.00 per video." He then proposed

that she take hidden camera videos elsewhere as well, suggesting "maybe invite

a few friends around and try on clothes, and record that. Just a thought." (See

Gov. Ex. 8).[3]

---

[3]  In addition to the example above, in November 2011, Ford sent an e-mail message to a 14-year-old girl

In addition to the already-detailed conversations, Ford sent his photo requests to a 16-year-old female with the initials E.B. in December 2013-January 2014, a 17-year-old female with the initials C.H. in October 2009, a 16-year-old female with the initials K.V. in June 2014, and an under aged female with the initials J.D. in July 2013-March 2014. Ford also sent his adult website advertisement seeking sexually explicit videos to the 17-year-old female with the initials C.H. in 2014, the underage female with the initials J.D. in July-March 2014,[4] and the 16-year-old female with the initials E.B. in March 2015 (stating that she wouldn't need to tell her parents), all of whom he had previously targeted with his talent scout ruse.

Ford knew full well that these victims were minors, as they had provided

---

with the initials C.B. (who had already provided him with her date of birth), stating that he had an urgent casting need for models, but it would require sending topless photos for consideration. When C.B. did not respond, Ford sent three follow up requests for photos. (See Gov. Ex. 9).

In January-February 2012, Ford sent a similar e-mail to a 16-year-old girl with the initials R.D., stating that he was evaluating models for two potential modeling jobs, paying 850 and 900 pounds respectively. When R.D. sent clothed photos for consideration, Ford told her he was unable to consider those photos because they were not topless. R.D. reluctantly sent two topless photos of herself, and Ford replied by asking for more, stating that most of his models send 10-15 photos for consideration. R.D. declined. A few months later, Ford redoubled his efforts, this time asking R.D. for fully nude photos, stating he was casting for Playboy. When R.D. declined, Ford increased the pressure by claiming that the shoot paid 3,000 pounds. (See Gov. Ex. 10).

[4] After J.D. sent numerous topless photos, Ford suggested that she consider doing videos for his adult website (J.D. declined). Ford also requested that she send "more daring" photos, at which point J.D. sent several fully nude photos with her hand covering her genitals. Ford again suggested, three more times, that she consider sending videos for his website. (See Gov. Ex. 7).

their birth dates during their initial conversations, and some expressed to him their concerns that their age was a possible impediment. Additionally, Ford appears to have specifically targeted minor females. He routinely expressed his interest in, in his words, sexually explicit photographs and videos of "young girls," "sexy girls," and "young women/girls." Notably, he offered to pay a premium for sexually explicit videos or photographs of girls. In one online chat exchange about hidden camera work with a female with the initials P.J. in March 2014, P.J. stated, "but u said u mostly pay for younger…still u say 2000-3000 GBP," and Ford confirmed, "yes, 2000 is for an average video…3000 is for a great video with younger women/girls." When P.J. asked how he could tell the ages of the females, Ford said, "people would know how young they are based on how the body looks." (See Gov. Ex. 11).

### In-Person Stalking

In October 2009, Ford, again posing as a talent scout, began communicating with a woman in London, with the initials S.L., about possible modeling opportunities. S.L. sent several photos, but their communication ended shortly thereafter. Several years later, in January 2013, Ford contacted S.L., asking if she'd be interested in a modeling opportunity. S.L. expressed some skepticism

about the legitimacy of his agency. He suggested they meet for coffee and then walk to his (fictitious) office. On March 13, 2013, S.L. arrived at the cafe as planned. Ford, knowing what S.L. looked like from her initial photos, watched her from afar but never engaged her.

Approximately 20 minutes later, Ford emailed S.L. saying they had missed each other. He mentioned casting for a photo shoot requiring topless photos. S.L. expressed reluctance, but Ford again stated that topless photos would be required. S.L. eventually sent topless photos with her face obscured. Ford responded that her face must be visible, and S.L. sent additional topless photos showing her face. Ford then suggested that they reschedule their in-person meeting to discuss modeling opportunities.

On March 14, 2013, S.L. arrived at the coffee shop as planned, and Ford again watched her from afar. S.L. emailed him five times asking where he was. Approximately 10 minutes later, Ford began sending S.L. harassing e-mails, including her work address and company information, suggesting that he followed her back to her office without her knowledge. He also threatened to send her topless photos to her boss. S.L. begged him to tell her why he was targeting her for **"the most sick and twisted thing ever."** Over the course of one

month, Ford sent several taunting e-mails to S.L.

On April 26, 2013, Ford sent S.L. an e-mail describing what she was wearing that day and asking who her "hot" friend was, suggesting that he was again following and watching S.L. in person. Over the course of two years, Ford continued to periodically harass S.L. via e-mail, sometimes with her topless photos attached, up until April 2015. (See Gov. Ex. 12).

## International Travel to Meet Victim

In late 2011, Ford began communicating with an 18-year-old female in San Francisco, with the initials F.G. Their communications began with Ford's model scout ruse, which resulted in F.G. sending several nude photographs to him. Over the course of several months, their communications became more personal, and they began a romantic, online relationship. Ford eventually revealed his true name to F.G. and professed his love for her. Ford spun a web of complicated lies to keep F.G. engaged and to garner sympathy from her. For example, he told F.G. that both of his parents died, that he was a recovering drug addict, and that his best friend committed suicide. Eventually, F.G. began to limit her contact, but Ford continually begged and pleaded for her to continue speaking with him. When these attempts were unsuccessful, he created yet another dramatic story to

16

entice F.G. to resume communications with him, claiming a near death experience and hospitalization.

In May 2012, Ford traveled to San Francisco and planned to meet F.G. From the e-mail communication, it appears that F.G. ended all communication and did not meet with him in person. Ford then became angry and began using her nude photos and personal information to harass F.G. by e-mail for almost two years, from May 2012 until February 2014. (See Gov. Ex. 13).

### Identity Theft

As previously mentioned, during Ford's model scout ruse, he obtained passwords to some of his victims' e-mail accounts. Using these stolen passwords, Ford hacked into these e-mail accounts and frequently sent e-mails from some of those accounts, posing as his victims. Ford used these hacked accounts to contact other aspiring models to vouch for "David Anderson" as a trustworthy talent scout and to refer business to him.[5]  Additionally, when particular women expressed concern as to his legitimacy as a model scout, Ford would encourage them to contact E.D. as a reference. Accordingly, by assuming the identity of

---

[5] For example, on June 26, 2014, he used the hacked account of a young female with the initials E.D. to send an e-mail to Jane Doe One, stating, "i've [sic] got a friend who runs a modelling agency here in London and he's always on the lookout for new talent." (See Gov. Ex. 4(a)).

some of his victims without their knowledge or consent, he was able to engage with, and obtain photos from, numerous other unsuspecting women.

### Possible online distribution of victims' photographs

In October 2013, Ford sent topless and nude photos of a woman with the initials J.G. to a third party for the purpose of posting them to a fake Facebook profile. The recipient responded, "OMG! hahaha thanks mate ur legend lol I gotta say that she looks well young in em though." The government does not know whether the photos were ever posted to Facebook as Ford planned or whether he had any additional communication with this, or any other, third parties. (See Gov. Ex. 14).

Additionally, in April 2015, Ford conducted several internet searches related to "anonIB," which is a well-known internet message board where anonymous users gather to share naked photographs of women without their consent (sometimes referred to as a "revenge porn" website). The government does not know whether he posted any of his stolen or fraudulently obtained photographs to any such message board.

### <u>ARGUMENT</u>

It is well settled that the Sentencing Guidelines are advisory, not

mandatory. *United States v. Booker*, 543 U.S. 220 (2005). The Court "may not presume that the Guidelines range is reasonable" and must make an individualized assessment based upon the facts presented. *Gall v. United States*, 552 U.S. 38, 50 (2007).

As set forth in the plea agreement, the parties agreed to a baseline/starting point Guideline's calculation of a level 24, with the government reserving the right to seek a two-level vulnerable victim adjustment and to move for an upward variance and an upward departure. For the reasons set forth below, and as partly captured in the Presentence Investigation Report (PSI), a two-level vulnerable victim adjustment is appropriate. Additionally, an upward variance and/or upward departure is warranted, for an ultimate sentence of 96 months.[6]

### A.  A Two-Level Vulnerable Victim Adjustment Should Apply, as Partly Reflected in the Presentence Investigation Report

In its PSI, the Probation Office determined that Ford's Total Offense level is 24, Criminal History I, resulting in a sentencing range of 51-63 months. This calculation takes into account several enhancements agreed to by the parties in the Plea Agreement and supported by the facts presented herein, including two

---

[6] The government recommends a sentence of 96 months regardless of whether the vulnerable victim adjustment is applied.

levels for a pattern of harassing the same victim, five levels for the non-grouping cyberstalking counts, and two levels for obstruction of justice. Although Probation agreed that Ford's conduct targeting vulnerable victims, to include minors as well as financially desperate adults, should give rise to a two-level adjustment, Probation applied that adjustment only in relation to Count 17, thereby not affecting the Total Offense Level. (The cyberstalking and computer hacking charges drive the Total Offense Level, in part because they have considerably higher base offense levels than the wire fraud charge.)

The government agrees with Probation's determination that the vulnerable victim adjustment applies to Ford's conduct, but it recommends that this Court apply the two-level vulnerable victim adjustment, pursuant to USSG § 3A1.1, to all counts in the Indictment, not solely to the wire fraud count.[7]  This results in a Total Offense Level of 26, with a sentencing range of 63-78 months of incarceration.

USSG § 3A1.1 provides for a two-level adjustment "if the defendant knew or should have known that a victim of the offense was a vulnerable victim," and the commentary explains that the definition of "vulnerable victim" includes not

---

[7] The government submitted to Probation an objection to this aspect of the PSI on March 1, 2016.

only a victim of the "offense of conviction," but also a victim of "any conduct for which the defendant is accountable under 1B1.3 (Relevant Conduct)." *See* USSG § 3A1.1, App. Note 2.

Here, there are two independent bases for applying the two-level vulnerable victim adjustment: Ford, in his relevant conduct, preyed upon known minors. He also preyed upon young adults that he knew were financially struggling or otherwise emotionally distressed during the time that he was targeting them.

As noted, Ford preyed upon at least seven females who he knew were underage. One such victim, as Ford was fully aware, was only 14 years old. Using his talent scout ruse, Ford successfully tricked at least three under-aged females into providing him with topless photographs of themselves. Using his "shared calendar" ruse, Ford successfully tricked still other minor females into providing them with their online passwords so that he could later hack into their online accounts to steal sexually explicit photographs of them. And using his adult website ruse, Ford attempted to obtain sexually explicit videos of minors.

The guidelines commentary specifically references age as a basis for finding that a victim is vulnerable. It defines "vulnerable victim" to include

someone who is "unusually vulnerable due to age…" In this particular case,

Ford's choice to continue to victimize minors after learning of their ages shows

the "extra measure of criminal depravity which § 3A1.1 intends to more severely

punish." *United States v. Davis*, 967 F.2d 516, 524 (11th Cir. 1992).

As set forth above, Ford clearly knew that some of his victims were

underage. He specifically targeted them, requesting videos of "young girls,"

"young sexy girls," and offering to pay a premium for hidden camera videos

involving "young women/girls." He continued to press his victims for sexually

explicit photographs and videos after he learned that they were minors. Ford in

no way backed off or tempered his conduct after learning of their ages. To the

contrary, Ford repeatedly assured his minor victims that they were not "too

young" for his (bogus) modeling gigs and employment opportunities. He

retained their photos in his repository account. On at least one occasion, he also

offered a "parental consent" form as an added enticement. Indeed, each time one

of the three underage females provided him with topless photographs of

themselves, Ford demanded additional, and more suggestive, photographs.

Ford chose to target young, naive women who would be less likely to

detect his fraud and would be easier to frighten and manipulate. Ford targeted

minors because they would be less likely to report suspected criminal conduct to their parents or authorities.

Furthermore, separate and apart from the minor victims, the Court should apply a two-level vulnerable victim adjustment because in his relevant conduct, Ford preyed upon young women who he knew were struggling financially and were therefore more desperate to accept his (bogus) employment offers and provide him with sexually explicit materials. Courts in this circuit and throughout the country have routinely held that victims who are in financial distress constitute vulnerable victims under similar circumstances, particularly where, as here, the defendant was offering to pay his victims money. *See, e.g.,* *United States v. Arguedas*, 86 F.3d 1054, 1058 (11th Cir. 1996) ("a victim's vulnerable financial situation may alone serve as the basis of a section 3A1.1 enhancement, if the defendant targeted the victim for that reason"); *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) ("financial desperation is enough to make one vulnerable to financial crimes"); *United States v. Zats*, 298 F.3d 182 (3d Cir. 2002) (holding that financial vulnerability is one way a victim can be otherwise particularly susceptible); *United States v. Pol-Flores*, 644 F.3d 1, 4 (1st Cir. 2011); *United States v. Fiorito*, 640 F.3d 338, 351 (8th Cir. 2011); *United States v.*

23

*Patasnik*, 89 F.3d 63, 72 (2d Cir. 1996); *United States v. Borst*, 62 F.3d 43, 47 (2d Cir. 1995).

For example, one of Ford's underage victims, 16-year-old E.B., confided in him that she lived in an African country, that her family and school life were extremely difficult, and that her family and she were under severe financial strain. She shared how miserable and stressed out she was, stating that she felt "trapped" without any hope or opportunities. Ford used this as leverage, offering her the adult video opportunity and stating, "the pay is very good…this could be a way for you to save up some money…it's a great way to earn some extra money and you could save it up…" When E.B. later confided in Ford that her father was about to lose his job, Ford responded, "I'm not going to say that I can pretend to understand what you are going though, because I can't. All I know is that in my opinion and I know you could do very well in this industry." (See Gov. Ex. 15)

In another example, in one lengthy online chat exchange in March 2014 with a female with the initials P.J., who apparently lived in India, Ford made a bogus offer to pay 2000-3000 pounds for a sexually explicit hidden camera video. Ford exclaimed, "It could certainly help someone who is struggling." When she

responded that such an amount is more than she could earn in her country in six
months, Ford responded, "I'm setting upi [sic] the payment of 260,000 Rupee to
you for the video...i just need you to send it over to me first."

As P.J. hesitated to send the requested videos, Ford grew angrier and
angrier. He claimed, "If you still want the money, you have 5 minutes to send me
the video you did yesterday. If I do not receive it in 5 minutes, I will not buy any
other video from you and I will not help you find modelling work. The choice is
yours and **you have 5 minutes starting NOW**." He then continued, "4
minutes...3 minutes...2 minutes...**wow, you just cost yourself 2550 Pounds. you
[sic] said that is more than most people make in a few months. Not a wise
move**." He continued to pressure her, "I want a yes or no answer from you. Are
you going to send me the video now so I can pay you." **"YES OR NO...YES OR
NO...YES OR NO...YES OR NO...**" P.J. responded, "**u r scaring me**," and yet
Ford continued harassing her. He complained, "i just don't understand you. **You
said you need money. This is very good money.**" P.J. again told Ford, "**u r so
insistant** [sic] **i real feel scary**...[sic]." After additional rounds of hounding her
with "**YES OR NO...YES OR NO...YES OR NO...,**" Ford concluded, "thanks
for wasting my time. **Good luck being poor**." (See Gov. Ex. 11). As these

examples show, Ford knowingly preyed upon the financial vulnerability of victims such as E.B. and P.J.

Ford clearly knew that these victims were vulnerable, due to both their ages and financial strains. In his objections to the PSI, Ford claimed that he was not specifically targeting minors in this case. However, his intent at the outset of scheme is not dispositive here. During the course of his conversations with his victims, he learned that some were minors and that some (including one of the minors) were financial desperate. After learning of those vulnerabilities, he seized upon them and persisted with his requests, continuing his attempts to defraud and exploit them. Because his wrongdoing was continuing in nature, the vulnerable victim adjustment is appropriate regardless of his initial reasons for targeting them. *See Arguedas*, 86 F.3d at 1058 (quoting *United States v. Thomas*, 62 F.3d 1332, 1345 (11th Cir.1995) ("Where the 'thrust of the wrongdoing' [is] continuing in nature, the defendants' attempt to exploit the victim's vulnerability will result in an enhancement even if that vulnerability did not exist at the time the defendant initially targeted the victim.")

As set forth in the objections the government submitted to Probation, the two-level vulnerable victim adjustment should apply across the board, not

merely to the wire fraud count. As noted, USSG § 3A1.1 allows for application of the vulnerable victim enhancement to victims of both the charged offense and the relevant conduct. USSG § 1B1.3(a)(1)(A) further provides that relevant conduct includes "all acts and omissions committed…or willfully caused by the defendant…that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Ford's ruses, particularly as they relate to his minor victims, constitute "all acts and omissions" occurring "during" or "in preparation for the offense of conviction," or in attempting to "avoid responsibility" for that offense, including not only the wire fraud offense but also the cyberstalking and hacking/sextortion offenses.

In assessing whether conduct is relevant for purposes of USSG § 1B1.3, a district court should look to the "similarity, regularity, and temporal proximity" between the offense of conviction and the uncharged conduct. *United States v. Amedeo*, 370 F.3d 1305, 1314 (11th Cir. 2004). *See also United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994). Here, Ford's earlier relevant conduct evolved seamlessly into his charged conduct as his behavior escalated. In fact, Jane Doe One was initially a target of Ford's talent scout ruse, and she was a minor at the

27

time. Ford later used her previously obtained partially nude photo, stolen from her hacked account, to engage in a frightening pattern of cyberstalking and harassment against her. Accordingly, the vulnerable victim adjustment should be applied to all charges in the Indictment, reflecting the entirety of Ford's criminal scheme, or at the very least, applied to Count One.

**B.**    **The Factors and Considerations Set Forth in 18 U.S.C. § 3553(a) Justify an Upward Variance to 96 Months of Incarceration**

An upward variance to 96 months of incarceration is warranted in this case, given the egregious facts and circumstances involved. This sentence is sufficient, but not greater than necessary, to accomplish the objectives set forth in 18 U.S.C. § 3553(a). As noted below, courts have repeatedly varied upwards in similar sextortion/cyberstalking cases around the country.

**1.    Nature and Circumstances of the Offense**

Ford's crimes and the impact on his victims were truly terrible. Ford began his six-year cyber-crime spree in 2009, posing as a talent scout to dupe hundreds of women, some of whom were minors, into sending him topless and fully nude photos. In his own words, there came a time where the photos were no longer "enough."

At that point, his conduct escalated significantly. He stalked one of his

28

victims in-person. He traveled internationally and attempted to meet one of his victims. And he began a campaign of terrifying harassment, demonstrating to his victims that he possessed their intimate photos, that he knew all of their personal information, and that he could release all of this information to the public at any time. He threatened to send sexual predators to his victims' homes to rape them. He distributed their photos to their personal contacts. He tried to coerce them into victimizing others. Perhaps most troubling, he tried to entice a minor into victimizing her peers. And in late April 2015, in preparation for a trip with his family to Atlanta, Ford sent e-mail solicitations to two Atlanta-area escorts. Ford obtained their information through his phishing and hacking scheme and had previously harassed one of them via e-mail. Attempting to meet his victims in person is a particularly troubling sign of escalation.

Ford was completely undeterred during the commission of his crimes. In fact, following Jane Doe One's report to law enforcement, local police served a subpoena on Google for information related to Ford's e-mail account. In turn, Google notified Ford of the issuance of the subpoena. This did nothing to dissuade him. He simply forwarded 480 e-mails from that account to another, presumably to save them for future access, and closed the account. He then

29

opened yet another e-mail account ([lookwhatihave666@gmail.com](mailto:lookwhatihave666@gmail.com)) and resumed his criminal activity.

Ford's conduct was relentless and strikingly callous. He harassed his victims on almost a daily basis. He was particularly motivated by their reactions of fear, anger, and defiance. He was unmoved by their pleas to leave them alone. He laughed in the face of their fear, and he escalated his threats when they threatened to involve the police. He showed no remorse and thrived on his power over his victims.

Ford's conduct was persistent and compulsive. He sometimes spent the majority of his work day, at taxpayer expense, engaged in his criminal scheme. This speaks powerfully about Ford's dedication to his crime. In addition, his conduct was incredibly brazen. He used his U.S. Embassy work computer (which was positioned in a common, shared work area) to commit his crimes and at one point, filed a complaint with his employer, requesting more privacy in his workspace.

Ford admitted that his primary motivation was to gain power and control over his victims. His number of victims is staggering. His conduct was repeated and long-lasting. He was relentless. Ford's conduct was that of a sexual predator.

### 2.    History and Characteristics of the Defendant

Ford is a 36-year-old man who was employed by the U.S. Embassy in London when he embarked on his criminal scheme. He is married with a child.

In 1998, Ford was arrested and charged with a felony peeping tom offense in Alpharetta, Georgia. The case was not presented to the grand jury. During his post-arrest interview in this case, Ford admitted that he had a prior arrest for "voyeurism" for attempting to take photographs of women in the changing rooms at the mall. Ford explained that he completed community service hours, and the case was subsequently dropped. While this charge was ultimately dismissed, it cannot be ignored as evidence of Ford's character, his disregard for others, and the likelihood that he will re-offend and escalate in the future. The crimes for which Ford stands convicted, though exponentially greater in scale and sophistication, are similar to the prior allegation. Both represent an abuse of power, a lack of respect for women and the law, and an extreme absence of personal judgment. Additionally, the underlying conduct related to his prior arrest is yet another illustration of how his behavior has escalated severely in recent years.

### 3.   Just punishment, respect for the law, deterrence, and public protection

A 96-month sentence reflects the seriousness of Ford's criminal conduct and would provide just punishment and respect for the law. A significant period of incarceration is necessary given the serious nature of Ford's offense, including the number of victims and the depth of harm he inflicted upon them during his 6-year crime spree. Furthermore, a 96-month sentence is needed to deter Ford from engaging in future criminal activity and to protect the public from his escalating conduct.

Additionally, a strong sentence is needed to deter other "sextortionists." Ford, along with other cyber predators, presumably already realize that, because they are hiding behind their computers and often operating overseas, it is less likely they will be detected or identified, let alone prosecuted in the United States. If, on top of that, they believe that the possible punishment is fairly mild if they are eventually prosecuted, there is a serious risk that these predators will conduct a cost-benefit analysis and continue their crimes unabated. Accordingly, general deterrence is an important factor here. As one District Judge stated in another hacking case: "[C]ybercrimes by their very nature allow offenders to commit the offenses without leaving their homes and with a veil of anonymity.

32

This lack of contact with the victims of their crimes and insulation from law enforcement may cause them to be under-deterred. Only successful prosecution and significant punishment will supply prospective cyber-criminals with the information needed to create real deterrence." *United States v. Watt,* 707 F.Supp.2d 149, 156-57 (D. Mass. 2010) (citations omitted).

      **4.     Avoiding Disparity Among Similarly-Situated Defendants**

Imposing the recommended 96-month sentence would bring the defendant's sentence in line with other sentences meted out by judges in similar cases around the country (many of which also involved upward departures/variances). For example, in 2012, 35-year-old Christopher Chaney was sentenced to an above-Guideline's 120 months for hacking into the email accounts of over 50 people and publicly posting their sensitive photographs. Chaney's Guidelines recommendation was 57-71 months. *United States v. Chaney* (CDCA 2012, 2:11-cr-00958). In 2013, 27-year-old Karen Kazaryan was sentenced to an above-Guideline's 60 months for hacking into hundreds of email accounts in search of sexually explicit photographs and extorting victims for more. The government calculated his Guideline recommendation of 36-42 months. *United States v. Kazaryan* (CDCA 2013, 2:13-cr-56). In 2011, 32-year-old Luis Mijangos

was sentenced to an above-Guideline's 72 months for hacking hundreds of victims' computers, obtaining sensitive images, and extorting victims for more photographs. The government-calculated Guideline recommendation was 36-42 months. *United States v. Mijangos* (CDCA 2011, 2:10-cr-743).

In February 2016, 22-year-old Nicholas Rotundo was sentenced to an above-Guideline's sentence of 42 months for using a breast study scam to trick four college-aged women into sending him photographs of their breasts and extorting them for more photographs. Rotundo's calculated Guideleines range was 24-30 months. Notably, this 42-month sentence involved significantly less serious conduct than Ford's: Rotundo victimized four adult victims (as opposed to the hundreds in this case, some of whom were minors), the photographs Rotundo obtained from his victims were primarily topless (as opposed to fully nude photographs), and unlike Ford, Rotundo actively cooperated with investigators to assist them in their investigation. *United States v. Rotundo* (E.D. Tex. 2014, 4;14-jm-00309). Finally, a few weeks ago on March 1, 2016, 31-year-old Michael Rubens was sentenced, with an upward variance, to 120 months for hacking into the online accounts of dozens of women during a period of three years, stealing photographs, and posting those photographs on a revenge porn

website. Rubens' calculated Guidelines range was 41-51 months, with an additional 24 months for an identity theft charge. *United States v. Rubens* (NDFL 2015, 4:15-cr-00033). Again, this 120-month sentence involved less significant conduct than the instant case, in which Ford engaged in his criminal activity for almost six years and victimized hundreds of women.

Based upon a review of similar cases, an above-guidelines sentence of 96 months is reasonable and would not result in an unwarranted sentencing disparity among similarly situated defendants. And based upon all of the above-articulated factors, an upward variance is appropriate here.

C.   **The USSG Calculation Fails to Adequately Reflect the Seriousness of the Offense, and An Upward Departure is Warranted**

Alternatively, an upward departure to a level 28, resulting a sentence of 96 months, is warranted in this case. As noted, recognizing that the Guidelines do not adequately reflect the seriousness of these types of offenses, courts have repeatedly imposed above-guidelines sentences in similar cases around the country.

The Court has the authority, under three separate USSG provisions, to apply an upward departure at sentencing. Pursuant to USSG § 5K2.0, the Court may find that there are aggravating circumstances not taken into consideration

by the guidelines. Here, there are several aggravating factors not adequately reflected in the guidelines calculation. First, Ford victimized hundreds of women with his charged conduct, as well as hundreds more considering his talent scout and adult website ruses. There is no applicable enhancement that reflects the sheer number of victims affected by Ford's conduct. Second, Ford conducted the vast majority of his criminal conduct from his desk at the U.S. Embassy in London during the work day, accounting for countless hours of lost productivity at taxpayer expense. There is no applicable guidelines provision to account for this type of loss to the U.S. Government.

Third, the guidelines do not adequately address the intentional infliction of emotional distress that Ford visited on his victims. Ford showed total disregard for his victims' privacy, their emotions, and their sense of safety. He laughed in the face of their fear. He admitted that he knew his victims felt terrible, but he wanted to feel "big" and "important," so he continued to escalate his behavior at their expense. His conduct took a tremendous toll on his victims. Jane Doe One told investigators that she considered carrying a gun, as she was afraid Ford would physically attack her at any time. Jane Doe Nine slept with a knife under her pillow, believing (based upon the content of Ford's e-mails) that

Ford was planning to "come down her fire escaped [sic]." Jane Doe Two was filled with fear and helplessness, found the experience terrifying, and fears the day that Ford is released from incarceration. (Gov. Ex. 16). This type of long-lasting, emotional impact on Ford's numerous victims is an aggravating circumstance not adequately reflected by the guidelines.

In addition, pursuant to USSG § 2A6.2 n.5, an upward departure may be warranted if the defendant received an enhancement under § 2A6.2(b)(1), but it does not adequately reflect the seriousness or extent of the conduct. Here, Ford received an enhancement under § 2A6.2(b)(1) for a pattern of harassing the same victim. However, this two level enhancement does not adequately reflect the extent of Ford's conduct for the same reasons discussed above.

Finally, pursuant to USSG § 5K2.21, an upward departure may be warranted based upon conduct underlying a "potential charge not pursued in the case as part of a plea agreement or for any other reason" as well as for conduct that did not enter into the guidelines calculation. The instant case presents significant underlying, uncharged conduct that did not factor into the guidelines calculation. As part of the plea agreement, the government agreed not to bring additional charges related to the conduct in this case. This includes

conduct that may have resulted in child pornography-related charges, as well as conduct that could have resulted in identity theft charges. As previously described in detail, Ford sought topless and nude photos and videos from several victims that he knew were minors. He tried to entice a minor victim, L.H., to produce videos of other minors changing in her school locker room. He also posed as some of his victims, using their hacked e-mail accounts to contact other unsuspecting women during the course of his talent scout scheme. This uncharged conduct falls squarely within the guidance provided by § 5K2.21.

Given the extreme emotional violence perpetrated by Ford, and given his persistent and pervasive efforts to victimize as many people as possible, the government recommends an upward departure to a level 28, resulting in a sentence of 96 months of incarceration.

## <u>CONCLUSION</u>

For the above-stated reasons, the United States recommends a sentence of 96 months of incarceration, followed by three years of supervised release, as such a sentence is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted this 14th day of March, 2016.


JOHN A. HORN, U.S. Attorney                TERESA MCHENRY, Chief
United States Attorney's Office              Human Rights and Special
Northern District of Georgia                 Prosecutions Section


____/s/_____                    ___/s/ _Jamie Perry_____
Kamal Ghali, Assistant U.S. Attorney         Jamie Perry, Trial Attorney
Georgia Bar No. 805055                       Mona Sedky, Senior Trial Attorney
United States Attorney's Office              U.S. Department of Justice
75 Spring Street, Southwest                  Criminal Division
Suite 600                                    1301 New York Avenue, Northwest
Atlanta, GA 30303                            Washington, D.C. 20530
Phone: (404) 581-6079                        Phone: (202) 307-3262
Kamal.Ghali@usdoj.gov                        Mona.Sedky@usdoj.gov
                                             Jamie.Perry@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on March 14, 2016, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.


By:      /s/ Jamie Perry
         Jamie Perry, Trial Attorney
         U.S. Department of Justice
         Criminal Division